UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
FEB 1 1 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

KENNETH ZERANTI,

          Plaintiff,

v.

UNITED STATES OF AMERICA and
ERICA L. SARGENT, PH.D.,

          Defendants.

**DECISION AND ORDER**

1:15-CV-00488 EAW

## <u>INTRODUCTION</u>

Plaintiff Kenneth Zeranti ("Plaintiff") brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, against defendants United States of America ("Defendant") and Erica L. Sargent, Ph.D. ("Dr. Sargent"), alleging negligence resulting in "permanent or long-standing emotional harm." (Dkt. 1). Specifically, Plaintiff claims that Dr. Sargent, Plaintiff's psychotherapist at the Veterans Administration ("VA") Hospital in Buffalo, New York ("Buffalo VAMC"), mismanaged Plaintiff's emotional dependence on her, engaged in a sexual, intimate relationship with Plaintiff, and then terminated the relationship "in an abrupt manner," causing Plaintiff to suffer "severe and debilitating depression." (*Id.* at ¶¶ 7-12). Plaintiff asserts two causes of action against Defendant: (1) a claim for vicarious liability based on Dr. Sargent's negligence, and (2) a claim for negligent supervision and/or retention. (*Id.* at 3-5).

Presently before the Court is the motion to dismiss brought by Defendant pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56. (Dkt. 37). Defendant seeks dismissal

- 1 -

of the claims asserted by Plaintiff for lack of subject matter jurisdiction. (*Id.* at 1; Dkt. 39 at 10, 16). Defendant also seeks summary judgment as to Plaintiff's second cause of action alleging negligent supervision. (Dkt. 37 at 1; Dkt. 39 at 19). For the following reasons, Defendant's motion is denied.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from Defendant's Rule 56 Statement of Undisputed Facts (Dkt. 40) ("Defendant's Statement"), Plaintiff's Response to Defendant's Statement of Undisputed Facts (Dkt. 42-3) ("Plaintiff's Statement"), and their supporting documents. The Court has noted where factual disputes exist and views all such disputes in the light most favorable to Plaintiff, as required on a motion such as this.

Plaintiff is a veteran who receives disability benefits through the Social Security Administration and the VA as a result of his diagnosis with major depression, dysthymia, anxiety, post-traumatic stress disorder, and obsessive-compulsive disorder. (Dkt. 40 at ¶¶ 3-9). Plaintiff has received continuous mental health treatment from the Buffalo VAMC since the late 1980s. (*Id.* at ¶ 16). From 1987 until August 2011, Plaintiff's therapist at the Buffalo VAMC was a clinical psychologist named Eddie Venzor, Ph.D. (*Id.* at ¶ 19). After Dr. Venzor's retirement, Plaintiff was transferred to Dr. Sargent, another psychologist at the Buffalo VAMC, for his mental health care. (*Id.* at ¶¶ 20, 26). For several months, Plaintiff was treated by a psychology intern Dr. Sargent supervised (*id.* at ¶¶ 21-23), and Dr. Sargent began personally counseling Plaintiff in December 2011 (*id.* at ¶ 45).

Psychologists at the Buffalo VAMC "function as independent practitioners" (*id.* at ¶ 27), and the VA does not require clinical supervision of its psychologists (*id.* at ¶ 31). However, psychologists employed at the Buffalo VAMC are supposed to complete an Ongoing Professional Practice Evaluation ("OPPE") every six months where a psychologist's chart timeliness, continuing education documentation, and case presentation are evaluated by the lead psychologist. (*Id.* at ¶ 34; Dkt. 42-3 at 34). Additionally, Dr. Sargent's administrative supervisor, Thomas Brent ("Brent"), had staff meetings with psychologists every other week to discuss their cases and would sometimes talk to Dr. Sargent one-on-one about treatment methods for cases with which she struggled. (Dkt. 40 at ¶¶ 42-43).

The Veteran's Health Administration Handbook requires patient health records to "be timely, relevant, necessary, complete, and authenticated." (Dkt. 42-2 at 27). Each VA facility is required to establish policies that "specify time standards for content, authentication, and completion" of patient records and "describe procedures for ongoing monitoring and reporting of individual delinquent records, responsible clinicians, and re-occurring delinquency patterns." (*Id.*). At the Buffalo VAMC, therapists were required to enter notes within five days of the sessions. (Dkt. 42-1 at ¶ 28).

Throughout 2012 and 2013, Dr. Sargent failed to complete the notes taken during her counseling sessions with many of her patients, including those with Plaintiff. (Dkt. 40 at ¶¶ 123-25). Dr. Sargent received a disciplinary warning on April 19, 2012, for failing to enter her notes in a timely manner, and Brent was supposed to monitor her note entry. (Dkt. 42-1 at ¶ 29). In November 2012, Dr. Sargent still had few substantive notes. (*Id.* at

¶ 26). No notes of any kind exist for Plaintiff's final 15 therapy sessions with Dr. Sargent. (*Id.*). The record does not show that Brent discussed this deficiency with Dr. Sargent. (*See id.* at ¶ 30).

On or before January 2013, Plaintiff began expressing affection to Dr. Sargent in their therapy sessions. (*Id.* at ¶ 46; Dkt. 42-3 at ¶ 46). A patient becoming infatuated with a therapist is a common occurrence in therapeutic settings and is referred to as the transference phenomenon. (Dkt. 40 at ¶¶ 48-50). Patients experiencing transference have feelings towards their therapist that are not necessarily based in reality, but occur because the therapist may be one of the few people who sits and listens to the patient and "who cares in an organized and thoughtful and attentive way." (*Id.*). Dr. Sargent had successfully handled transference situations twice previously in her career (*id.* at ¶ 64), and prior to 2013, she had never engaged in a sexual or romantic relationship with a patient (*id.* at ¶ 65).

Between January and March 2013, Plaintiff started expressing his affection for Dr. Sargent more vehemently by writing her letters and cards and by leaving her voicemails until her inbox was full. (Dkt. 42-2 at 152). Plaintiff gave several gifts to Dr. Sargent, including crystal sculptures (*id.* at 157) and a three-and-a-half-foot tall flower arrangement that Dr. Sargent placed in the reception area (*id.* at 218). The hospital staff noticed that Plaintiff brought these gifts to Dr. Sargent (*id.* at 223), and on at least one occasion, a hospital staff member admonished Plaintiff for doing so (*id.* at 165). Additionally, Plaintiff referred to Dr. Sargent as "hot Dr. Sargent" in front of Buffalo VAMC staff members throughout this time. (*Id.* at 223).

- 4 -

In March or April 2013, Dr. Sargent claims she met with Brent to ask for guidance about how to handle Plaintiff's affection.[1] (Dkt. 40 at ¶ 55). She also met twice with one of her peers, Dr. Elizabeth Wahlig ("Dr. Wahlig"). (Dkt. 42-2 at 272). During these meetings, Dr. Sargent told Brent and Dr. Wahlig that she "was in distress over [Plaintiff] pushing the boundaries and pursuing me in a romantic way. And that I did not know anything further that I could do to set the boundaries and to keep him from doing more." (*Id.* at 222-23). Both Brent and Dr. Wahlig encouraged Dr. Sargent to reinforce appropriate therapeutic boundaries with Plaintiff. (Dkt. 40 at ¶ 59). During Dr. Sargent's second meeting with Dr. Wahlig, Dr. Wahlig noted that she felt "concerned that [Plaintiff] had not backed down gracefully nor respected the limits that [Dr. Sargent] was trying to enforce but had, in fact, become more insistent." (Dkt. 42-2 at 340). Dr. Wahlig concluded Dr. Sargent should transfer Plaintiff to another therapist, but never advised Dr. Sargent to do so. (*Id.* at 341). Brent also testified that, as a general matter, if a therapist he supervised came to him with concerns about a patient's attraction or an exchange of gifts, he would talk to them about next steps, one of which would be transferring the patient. (*Id.* at 251). Brent did not speak with Dr. Sargent about transferring Plaintiff to another therapist. (*Id.* at 223).

Sometime between when these meetings occurred and May 11, 2013, Dr. Sargent met with Plaintiff for the first time in a personal way on the grounds of the Buffalo VAMC. (*Id.* at 153, 223). She encouraged him to ride by an outside picnic area on his Harley

---

[1]     Defendant notes there is a factual dispute as to whether this meeting actually occurred, but concedes that it did for the purposes of the instant motion. (Dkt. 40 at 7 n.1).

motorcycle with his dogs, and at least one of the other hospital employees saw this happen. (*Id.*). Also during this time, Dr. Sargent left some of the cards Plaintiff had written to her on her office desk, removing them only after Plaintiff expressed surprise that she would display them. (*Id.* at 152-53).

On May 11, 2013, Dr. Sargent, wearing a hat and trench coat, met with Plaintiff off hospital grounds at a coffee shop. (Dkt. 40 at ¶¶ 71-72). From there they drove separately to a nearby park, and Dr. Sargent then got into Plaintiff's car where they kissed for an hour. (*Id.* at ¶¶ 74-75). A day or two later, Plaintiff states that he had a therapy session with Dr. Sargent where they "[w]ent through the formality of what would ordinarily be a mental health appointment" before hugging and kissing in Dr. Sargent's office. (Dkt. 42-2 at 155).[2] Several days later, Plaintiff took Dr. Sargent for a ride on his motorcycle to a different park and kissed her under a tree. (Dkt. 40 at ¶¶ 76-77). Plaintiff purchased a $1,000 motorcycle jacket and helmet for Dr. Sargent, along with a dark visor so she could hide her face. (*Id.* at ¶¶ 97-98).

On May 18, 2013, Dr. Sargent met Plaintiff at his home, where they had sex. (*Id.* at ¶ 78). Dr. Sargent spent the night with Plaintiff at his house, and several hours the next day. (*Id.* at ¶¶ 79-80). She returned to Plaintiff's home on or about May 22, 2013, and met his adult daughter. (*Id.* at ¶ 81; Dkt. 42-3 at ¶ 81). Plaintiff told his daughter that he and Dr. Sargent had been seeing each other and that they loved each other. (Dkt. 40 at ¶ 83; Dkt. 42-2 at 133, 169). He asked his daughter to promise to not say anything "because

---

[2]     Dr. Sargent contends no such encounter happened. (Dkt. 42-2 at 228).

there was so much at stake," telling her that Dr. Sargent could lose her job. (Dkt. 40 at ¶ 84). Dr. Sargent showed Plaintiff's daughter pictures of her own two girls, and then told the daughter that she planned to transfer Plaintiff to another therapist eventually, but that "these things take time." (*Id.*).

During the period that they were seeing each other, Plaintiff gave Dr. Sargent a key to his home, and Dr. Sargent left at least five romantic voicemails on Plaintiff's phone. (*Id.* at ¶¶ 90, 100). She visited him at his house on the evening of May 24, 2013, and spent the next day with him, attempting to disguise herself with a trench coat and hat when she came and went. (*Id.* at ¶¶ 87-89). Dr. Sargent told Plaintiff that "she wanted to spend the rest of her life with [him]" and came up with a plan to transfer him to a different colleague so that, after two or so years of him not being her patient, they could be together. (*Id.* at ¶¶ 92-93). She bought Plaintiff a plane ticket to Montana so that he could meet her parents and brother, and she also introduced her daughters to Plaintiff. (*Id.* at ¶¶ 94-96). Plaintiff contends that Dr. Sargent told Plaintiff as "the relationship was consummated, that she would be there as my doctor. She would always be there."[3] (Dkt. 42-2 at 152). Throughout this time, Dr. Sargent and Plaintiff engaged in sexual relations three times, all at Plaintiff's home. (Dkt. 40 at ¶ 99).

---

[3] Defendant argues that the Court should disregard this portion of Plaintiff's deposition testimony because he also states that Dr. Sargent made a plan to transfer Plaintiff to another therapist. (Dkt. 43 at 5). The Court does not find the content of the statements dispositive. In other words, Dr. Sargent could have planned to transfer Plaintiff to facially comport with the ethical rules of her profession while still unofficially serving as Plaintiff's therapist.

On May 26, 2013, Dr. Sargent spent part of the day with Plaintiff before telling him that she "wanted a day apart from him to settle [her] emotions." (*Id.* at ¶ 101). She visited Plaintiff again at his home on May 27, 2013, and he became very aggressive and started screaming at her, causing Dr. Sargent to fear for her own safety. (*Id.* at ¶ 102). She told Plaintiff that they needed to end the relationship. (*Id.* at ¶ 103).

Plaintiff disclosed the affair to Brent and the head psychologist, Dr. Frohm, on May 28, 2013. (*Id.* at ¶ 110). Prior to this disclosure, no one at the Buffalo VAMC knew about the affair. (*Id.* at ¶ 111). That day, the Buffalo VAMC arranged for Plaintiff to be transferred to another psychologist (*id.* at ¶ 118), and over the next few days, Plaintiff had several counseling sessions (*id.* at ¶¶ 120-21). The VA currently pays for Plaintiff's mental health care outside the VA system. (*Id.* at ¶ 122).

Dr. Sargent was removed from patient care on May 29, 2013, and placed on administrative leave on May 31, 2013. (*Id.* at ¶¶ 112-13). She resigned from her position on June 10, 2013. (*Id.* at ¶ 114). The VA reported Dr. Sargent's misconduct to the New York State Office of Professions on August 8, 2015, and to the National Practitioner Data Bank on May 20, 2016. (*Id.* at ¶¶ 116-17; Dkt. 42-3 at ¶¶ 116-17).

## II.    Procedural Background

On July 15, 2014, Plaintiff submitted a claim to the Department of Veterans Affairs (Dkt. 1 at ¶ 14), which was subsequently rejected on May 6, 2015 (*id.* at ¶ 15). Plaintiff commenced this action on June 4, 2015. (Dkt. 1). On August 13, 2015, Defendant filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. (Dkt. 5). The Court denied the motion but noted that Defendant's argument as to the

subject matter jurisdiction claim was "subject to renewal after the completion of discovery." (*Id.* at 10).

Defendant filed the instant motion on July 11, 2018. (Dkt. 37). Plaintiff submitted his response in opposition on August 1, 2018 (Dkt. 42), and Defendant replied on August 8, 2018 (Dkt. 43). Oral argument was held before the undersigned on December 19, 2018, at which time the Court reserved decision. (Dkt. 44). Defendant submitted a supplemental letter to the Court on December 20, 2018, over Plaintiff's objections. (Dkt. 47).

## DISCUSSION

### I. Legal Standard

#### A. 12(b)(1) Motion

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that the court retains jurisdiction." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). "[T]he district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003), *aff'd*, 249 F. App'x 851 (2d Cir. 2007). "The court

may consider affidavits and other materials beyond the pleadings but cannot rely on conclusory or hearsay statements contained in the affidavits." *Young v. United States*, No. 12-CV-2342 ARR SG, 2014 WL 1153911, at *6 (E.D.N.Y. Mar. 20, 2014) (quotation omitted).

**B.** **Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*,

781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.   Vicarious Liability Claim

Defendant seeks dismissal of the first cause of action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Dr. Sargent was not acting within the scope of her employment when she engaged in sexual relations with Plaintiff and, therefore, Defendant may not be held liable under the FTCA. (Dkt. 39 at 10-16).

The "United States, as sovereign, is immune from suit save as it consents to be sued. . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation omitted). Under the FTCA, the United States has provided a limited waiver of sovereign immunity for claims of money damages against the United States for injury or loss of property caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his or her office or employment. 28 U.S.C. § 1346(b). "For there to be liability, the employee's act must have taken place 'while acting within the scope of his office or employment, under circumstances where the United States, if a

- 11 -

private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Rosse v. United States*, 110 F. Supp. 3d 415, 421 (N.D.N.Y. 2015) (quoting 28 U.S.C. § 1346(b)(1)). In other words, if the federal employee was acting outside the scope of his or her employment, then the FTCA does not apply, and the Court does not have jurisdiction over a vicarious liability claim asserted against the United States for its employee's negligence.

"We interpret the FTCA's 'scope of employment' requirement in accordance with the *respondeat superior* law of the jurisdiction where the tort occurred. . . ." *Fountain v. Kim*, 838 F.3d 129, 135 (2d Cir. 2016). There is no dispute that the alleged negligence occurred in the State of New York and that New York tort law applies in this instance. (Dkt. 39 at 11).

"Under New York law, an employee's tortious acts fall within the scope of his employment if 'done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions.'" *United States v. Tomscha*, 150 F. App'x 18, 19 (2d Cir. 2005) (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979)). On the other hand, conduct falls outside the scope of employment if done "solely for personal motives unrelated to the furtherance of the employer's business." *Catania v. Herbst*, 916 F. Supp. 2d 266, 272 (E.D.N.Y. 2013) (quotation omitted); *see also Galvani v. Nassau Cnty. Police Indemnification Review Bd.*, 242 A.D.2d 64, 68 (2d Dep't 1998) ("An employer will not be held liable . . . for actions which were not taken in furtherance of the employer's interest and which were undertaken by the employee for wholly personal motives."). Under New York law, the scope of employment analysis considers five factors:

- 12 -

[1] the connection between the time, place and occasion for the act; [2] the history of the relationship between employer and employee as spelled out in actual practice; [3] whether the act is one commonly done by such an employee; [4] the extent to which the act departs from normal methods of performance; and [5] whether the specific act was one that the employer could reasonably have anticipated.

*Riviello*, 47 N.Y.2d at 303.

Defendant contends that, as a matter of law, Dr. Sargent's conduct cannot fall within the scope of employment. "The Second Circuit recognizes that where the issue of subject matter jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the court should use the standard applicable to a motion for summary judgment and dismiss for lack of jurisdiction only where there are no triable issues of fact." *Hamm v. United States*, 439 F. Supp. 2d 262, 263-64 (W.D.N.Y. 2006), *aff'd*, 483 F.3d 135 (2d Cir. 2007) (citing *London v. Polishook*, 189 F.3d 196, 198-99 (2d Cir. 1999)). *See also Zink v. First Niagara Bank, N.A.*, 18 F. Supp. 3d 363, 367 (W.D.N.Y. 2014) (denying motion to dismiss for lack of diversity jurisdiction where conflicts of fact existed and required adequate discovery); *Porter v. United States*, No. 13 CIV. 7332(NRB), 2015 WL 1004953, at *3 (S.D.N.Y. Mar. 3, 2015) (denying Fed. R. Civ. P. 12(b)(1) motion to dismiss FTCA case where facts were in dispute). *Cf. Grace v. United States*, 754 F. Supp. 2d 585, 598 n.8 (W.D.N.Y. 2010) (finding the question of jurisdiction was not intertwined with the merits where "the merits of Plaintiff's claim primarily involve the question of whether [the doctor] deviated from the standard of care, not whether she was an employee of the VA."). The resolution of the "scope of employment" issue here is tied

to the ultimate resolution of the merits of Plaintiff's claims. Therefore, the Court will apply a summary judgment standard to the subject matter jurisdiction analysis here.

Defendant argues that the evidence obtained during discovery demonstrates that "Dr. Sargent's affair with [P]laintiff was undertaken for wholly personal motives and in no way furthered the VA's business of providing mental health care to veterans." (Dkt. 39 at 13). Defendant asserts that the relationship involved "genuine and repeated expressions of love and the desire on the part of both parties to build a lifelong partnership together," and points to the testimony of Plaintiff's daughter, who stated that Dr. Sargent was planning to eventually switch Plaintiff to another therapist. (Dkt. 39 at 13; Dkt. 40 at ¶ 84). Defendant also argues that the inappropriate behavior falls outside the scope of employment under the factors set forth in *Riviello* because: (1) it did not take place at the VA hospital;[4] (2) Dr. Sargent's behavior is prohibited by ethics rules and thus departs from normal practice; and (3) Defendant could not have reasonably anticipated the affair because Dr. Sargent successfully dealt with transference situations in the past and actively concealed the affair. (Dkt. 39 at 14). Moreover, Defendant asserts the facts demonstrate the affair was not a professional mishandling of Plaintiff's transference or part of a treatment plan for Plaintiff, but a personal choice made by Dr. Sargent to enter into a serious love affair. (*Id.* at 15).

---

[4]  Defendant argues that Plaintiff concedes the entire affair took place off VA property because Plaintiff admitted to paragraph 109 of Defendant's Statement, which states, "Dr. Sargent's inappropriate behaviors with plaintiff 'were outside [her] role as his therapist,' 'occurred off federal property,' and 'outside [her] tour of duty.'" (Dkt. 40 at ¶ 109 (alterations in original)). However, Plaintiff only stated that "Dr. Sargent so testified at her deposition." (Dkt. 42-3 at ¶ 109).

"New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998). In most of the New York State cases that address relations between a therapist and patient, the sexual relationship occurred off the employer's premises and after the psychotherapist relationship had ended. *See, e.g., Marpe v. Dolmetsch*, 280 A.D.2d 795, 796 (3d Dep't 2011) (holding the sexual acts did not occur within the scope of employment because "the allegedly offending conduct occurred during nonworking hours, off the [employer's] . . . premises and after [the psychiatric social worker] . . . had been precluded from treating patients"); *Koren v. Weihs*, 190 A.D.2d 560, 561 (1st Dep't 1993) (holding a resident's continued "treatment" of the plaintiff with "sex therapy" at his home subsequent to the plaintiff's discharge from the hospital did not constitute continuous medical treatment which might be imputed to the hospital under the doctrine of *respondeat superior*); *Noto v. St. Vincent's Hosp.*, 160 A.D.2d 656, 656 (1st Dep't 1990) (affirming a grant of summary judgment in favor of the defendant hospital, where the attending psychiatrist engaged in sexual relations with the plaintiff after she had been discharged and after he had ceased treating her as his patient).

However, at least one New York State court has held that a therapist's commencement of a sexual relationship with the plaintiff while still serving as the plaintiff's therapist fell outside the scope of employment. *McKay v. Healthcare Underwriters Mut. Ins. Co.*, 295 A.D.2d 686, 687-88 (3d Dep't 2002), *leave to appeal denied by* 99 N.Y. 2d 503 (2002). The *McKay* court found "[t]he fact that [the]

therapist/client relationship with plaintiff may have continued [while the sexual relationship was ongoing] is irrelevant to the question of whether his tortious conduct was outside the scope of his employment." *Id.* at 687. It stated, "[t]he sexual relationship had no valid treatment purpose and no legitimate . . . business purpose." *Id.* Additionally, the court found it significant that the plaintiff claimed the therapist "misused or exploited the phenomenon of transference to develop a sexual relationship with [the plaintiff]" because it "constitutes a form of patient or client abuse" that brought the therapist's conduct outside the scope of employment. *Id.* at 688.

Overall, the weight of New York case law[5] appears to support Defendant's position with regard to the sexual relationship between Plaintiff and Dr. Sargent. However, looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find that Dr. Sargent was negligent in her handling of the transference phenomenon before the sexual relationship began. The record shows that after Dr. Sargent became uncomfortable with Plaintiff's expressions of affection towards her, she did not ask to transfer Plaintiff for reasons related to his psychological treatment—she was concerned that "a sudden ending" of their patient-therapist relationship would "adversely affect" Plaintiff. (*Id.* at

---

[5]    Other courts have found that under New York law a therapist's sexual relationship with a patient is relevant to psychiatric treatment. However, these determinations were not made in the scope of the employment context. *See, e.g., Vigilant Ins. Co. v. Emp'r Ins. Of Wausau*, 626 F. Supp. 262, 266 (S.D.N.Y. 1986) (finding in the malpractice context that "a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them" (citation omitted)), *abrogated on other grounds, Dodge v. Legion Ins. Co.*, 102 F. Supp. 2d 144 (S.D.N.Y. 2000); *Dodge*, 102 F. Supp. 2d at 152 (finding in the insurance context that "it is widely recognized that a sexual relationship between a therapist and a patient irreparably disrupts the course of the treatment, as it inevitably undermines the patient's trust in the therapist").

220); *see Mele v. Hill Health Ctr.*, 609 F. Supp. 2d 248, 256 (D. Conn. 2009) (finding the defendants' decision to terminate the plaintiff's treatment was within the scope of employment because the decision was based on reasons related to the plaintiff's medical care). A reasonable trier of fact could also find that this concern for Plaintiff's mental well-being distinguishes Dr. Sargent from the therapist in *McKay*, 295 A.D.2d 686, because it demonstrates that, at least initially, Dr. Sargent did not misuse Plaintiff's transference to develop a sexual relationship with him.

As far as the *Riviello* factors are concerned, the record before the court shows that Dr. Sargent's handling of Plaintiff's transference before the sexual relationship commenced took place at least partially on the Buffalo VAMC's property: Plaintiff had his therapy sessions with her at the hospital (Dkt. 40 at ¶ 45), he brought gifts to her at the hospital (*id.* at ¶ 47), and Dr. Sargent met with Brent and Dr. Wahlig on hospital property (*id.* at ¶¶ 55, 58). Additionally, it is undisputed that Dr. Sargent was an employee of the Buffalo VAMC (*id.* at ¶ 20), and that therapists commonly handle the transference phenomenon with patients (*id.* at ¶ 50). Looking at the record in the light most favorable to Plaintiff, Dr. Sargent's initial mishandling of Plaintiff's transference, *i.e.*, her decision to not ask for Plaintiff's reassignment, did not depart from the normal methods of performance for therapists at the Buffalo VAMC because reassigning patients at the Buffalo VAMC "was generally discouraged." (Dkt. 42-2 at 218).

Moreover, the record before the Court shows that Dr. Sargent's mishandling of the transference is something that the Buffalo VAMC could have reasonably anticipated. Looking at the record in the light most favorable to Plaintiff, Dr. Sargent told Dr. Wahlig

- 17 -

and Brent that she "was in distress over [Plaintiff] pushing the boundaries and pursuing me in a romantic way. And that I did not know anything further that I could do to set the boundaries and to keep him from doing more."[6] (*Id.* at 223). Both Dr. Wahlig and Brent stated they would normally advise someone in Dr. Sargent's situation to transfer the patient, presumably in part to prevent or stymie a therapist's mishandling of the transference phenomenon, but that neither of them did so. (*Id.* at 251, 341).

Additionally, staff members at the hospital knew that Plaintiff called Dr. Sargent "hot Dr. Sargent" (*id.* at 223), and they knew that Plaintiff was giving Dr. Sargent increasingly extravagant gifts,[7] such as a three-and-a-half-foot tall flower arrangement (*id.* at 165) and crystal sculptures (*id.* at 157). On one occasion, a staff member admonished Plaintiff for bringing these gifts to Dr. Sargent (*id.* at 165), demonstrating that there was

---

[6]     Defendant contends that during these meetings, Dr. Sargent did not mention "that she was having difficulty with her feelings romantically or that she might be getting involved with this man in an inappropriate fashion" (Dkt. 40 at ¶ 70 (quotation and alterations omitted)), implying that Dr. Sargent was experiencing personal romantic feelings for Plaintiff at that time, and consequently that her decisions were made in a personal capacity, not a professional one. However, Dr. Sargent contends that, at the time of those conversations, she "did not want" a relationship with Plaintiff, and that she *never* felt like she wanted to have a romantic relationship with Plaintiff. (Dkt. 42-2 at 215, 223). Dr. Sargent's motives and feelings are disputed issues of material fact, and their resolution is not appropriate on a summary judgment motion. Instead, as is required on a motion for summary judgment, the Court views these facts in the light most favorable to Plaintiff.

[7]     Defendant posits that Plaintiff giving gifts to Dr. Sargent "was not a red flag of an imminent romantic relationship between patient and therapist because it's a very frequent occurrence that a patient will give a gift to a therapist." (Dkt. 40 at ¶¶ 52-53). While Defendant's expert did testify that gift-giving was a frequent occurrence, he also stated it "would be an event that would raise questions," and did not specifically address the number and type of gifts hospital staff members saw Plaintiff give Dr. Sargent in this case. (Dkt. 42-2 at 307).

an awareness at the Buffalo VAMC that such behavior was not only ongoing but inappropriate. Moreover, at least one of the staff members witnessed the incident where Defendant rode by the Buffalo VAMC on his motorcycle at Dr. Sargent's request. (*Id.* at 153, 223). A reasonable trier of fact could find such incidents could and did raise red flags for hospital staff members and that, accordingly, Defendant could reasonably have anticipated that Dr. Sargent was mishandling Plaintiff's transference.

In light of the New York case law discussed earlier regarding doctor and therapist sexual misconduct, a reasonable trier of fact could find that Dr. Sargent, at some point, began acting outside her scope of employment. However, determining exactly when that happened requires resolution of material issues of fact and line-drawing inappropriate for a summary judgment motion. Accordingly, the Court determines that, looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find that at least some of Dr. Sargent's actions fell within the scope of her employment and that Defendant is vicariously liable. As a result, Defendant's motion to dismiss the first cause of action pursuant to Rule 12(b)(1) is denied.

## III.  Negligent Supervision Claim

### A.  Discretionary Function Exception to Sovereign Immunity Waiver

Defendant argues that Plaintiff's negligent supervision claim is barred by the discretionary function exception to the FTCA's waiver of sovereign immunity, and that Plaintiff's claim should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). (Dkt. 39 at 16-19). For the reasons that follow, the Court declines to dismiss the negligent supervision claim for lack of subject matter jurisdiction at this time.

The FTCA provides that the waiver of the Government's sovereign immunity for negligent acts of its employees "shall not apply to . . . [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception reflects the decision by Congress to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). In other words, the Government waives its sovereign immunity under the FTCA in limited circumstances, but that waiver does not apply to instances where the Government action in dispute is a policy decision. "Plaintiffs bear the initial burden to state a claim that is not barred by the [discretionary function exception]." *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013).

To fall within the discretionary function exception, "(1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (quoting *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991), and *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)). "Since the exception turns on the presence or absence of discretion and since '[d]iscretionary conduct is not confined to the policy or planning level,' there is no reason that 'decisions made at an operational level [can] not also be based on policy.'"

*Vaizbud v. United States*, 90 F. Supp. 2d 210, 214 (E.D.N.Y. 2000) (alterations in original) (quoting *Gaubert*, 499 U.S. at 325-26).

"There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7. "In order for a claim of negligent . . . supervision to be barred by the discretionary function exception, the decision to . . . supervise the negligent employees must be 'grounded in considerations of public policy or susceptible to policy analysis.'" *Gibbons v. Fronton*, 533 F. Supp. 2d 449, 455 (S.D.N.Y. 2008) (quoting *Coulthurst*, 214 F.3d at 109); *see Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[S]upervision decisions involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety. . . . Such decisions are surely among those involving the exercise of political, social, or economic judgment."). "Where the alleged 'type of negligence' arises from factors such as inattentiveness, laziness, absentmindedness or other such 'conduct unrelated to any plausible policy objectives,' it is not shielded by the discretionary function exception." *Ben v. United States*, 160 F. Supp. 3d 460, 473 (N.D.N.Y. 2016) (quoting *Coulthurst*, 214 F.3d at 110-11). As with the scope of employment issue discussed earlier in this decision, the subject matter jurisdiction question presented here is intertwined with the merits, and therefore the summary judgment standard applies. *See Hamm*, 439 F. Supp. 2d at 263-64.

In the instant matter, in order for the Court to have subject matter jurisdiction over Plaintiff's negligent supervision claim, he must show that the Buffalo VAMC decided to not supervise Dr. Sargent more closely because it was being inattentive, absentminded, or otherwise not acting pursuant to a policy objective. If, looking at the evidence in the light most favorable to Plaintiff, a reasonable trier of fact *could only* find that the Buffalo VAMC *was* acting pursuant to a policy objective, then the discretionary function exception applies, and Plaintiff's negligent supervision claim is barred by sovereign immunity. However, if a reasonable trier of fact *could* find that the Buffalo VAMC was *not* acting pursuant to a policy objective, then the discretionary function exception does not apply, and the Government's sovereign immunity is waived as to Plaintiff's negligent supervision claim.

Defendant argues that the Buffalo VAMC's decision to not supervise Dr. Sargent on a day-to-day basis falls within the discretionary function exception because no regulations, policies, or directives require the VA to supervise licensed psychologists, and additionally the VA hospital made a policy decision to not supervise its therapists day-to-day based on functional impossibility. (Dkt. 39 at 18-19). Plaintiff asserts that the decisions made by Dr. Sargent's supervisors were a result of abdication of their responsibilities, not of policy decisions.[8] (*Id.* at 21-23).

---

[8]     Plaintiff also argues that Defendant waived this argument when it did not include it in the Answer because sovereign immunity is an affirmative defense, and a defendant waives affirmative defenses if they are not pleaded in the answer. (Dkt. 42 at 19-20 n.2). However, the discretionary function exception is a sovereign immunity issue and therefore a question of subject matter jurisdiction, so it may be raised at any time regardless of whether it was included in Defendant's Answer. *Dockery v. Tucker*, No. 97-CV-3584 (ARR), 2006 WL 5893295, at *7 n.15 (E.D.N.Y. Sept. 6, 2006) ("Plaintiff's argument that [the defendant] waived his objection to subject matter jurisdiction is without merit, as

The Court finds a reasonable trier of fact could determine that the VA Hospital's decision to not supervise Dr. Sargent resulted from a dereliction of duties as opposed to any policy decision—and thus, the discretionary function exception does not apply. Looking at the evidence in the light most favorable to Plaintiff, Dr. Sargent met twice with Dr. Wahlig[9] and once with supervisor Brent, telling them that she "was in distress over [Plaintiff] pushing the boundaries and pursuing me in a romantic way. And that I did not know anything further that I could do to set the boundaries and to keep him from doing more." (Dkt. 42-2 at 222-23). The record viewed in the light most favorable to Plaintiff shows that during Dr. Sargent's second meeting with Dr. Wahlig, Dr. Wahlig "was concerned that [Plaintiff] had not backed down gracefully nor respected the limits that [Dr. Sargent] was trying to enforce but had, in fact, become more insistent" (*id.* at 340), and that Dr. Wahlig concluded Dr. Sargent should transfer Plaintiff to another therapist, but never advised Dr. Sargent to do so (*id.* at 341). Brent also testified that if a therapist he supervised came to him with concerns about a patient's attraction or an exchange of gifts,

---

challenges to subject matter jurisdiction may be raised at any time, and indeed may be raised by the Court *sua sponte*." (citation omitted)); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008) ("The FTCA discretionary function exception is . . . a form of retained sovereign immunity.").

[9]    Although Dr. Wahlig was not Dr. Sargent's supervisor, she was the chair for the professional standards committee. (Dkt. 42-2 at 317). Dr. Karl Frohme, the lead psychologist at the Buffalo VAMC, testified that if someone in Dr. Wahlig's role received a communication from a colleague that implicated ethical breaches, "her next step would be to disclose that to a manager or to the lead psychologist." (*Id.* at 284, 317). Accordingly, looking at the record in the light most favorable to Plaintiff, the Court treats Dr. Wahlig as having a supervisory capacity for the purposes of this motion.

he would talk to them about next steps, including transferring the patient. (*Id.* at 251). Brent did not do so after his conversation with Dr. Sargent. (*Id.* at 223). A reasonable trier of fact looking at the evidence in the light most favorable to Plaintiff could find that the failure of Dr. Sargent's supervisors to advise her to transfer Plaintiff to another therapist was due to inattentiveness or absentmindedness, and was "unrelated to any plausible policy objectives." *Coulthurst*, 214 F.3d at 111. The Court cannot resolve the issue of whether the discretionary function exception applies without resolving the factual issues in this case. Therefore, the Court declines at this time to dismiss Plaintiff's negligent supervision claim on the basis of a lack of subject matter jurisdiction.

### B. Summary Judgment on Plaintiff's Negligent Supervision Claim

In his second cause of action, Plaintiff alleges that Dr. Sargent's supervisors knew or had reason to know of her inappropriate relations with Plaintiff and nevertheless failed to "make an effort to terminate the harmful relationship and/or minimize its consequences to Plaintiff."[10] (Dkt. 1 at ¶¶ 24-29). Defendant argues that summary judgment pursuant to Fed R. Civ. P. 56 is appropriate because Plaintiff has not alleged that: (1) the VA was aware

---

[10]     The Court recognizes that Plaintiff may only prevail with such a claim if Dr. Sargent, in contrast to Plaintiff's vicarious liability claim, was acting *outside* the scope of her employment. *Velez v. City of New York*, 730 F.3d 128, 136-37 (2d Cir. 2013). However, Plaintiff may pursue alternative theories of liability with his pleading, Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."), and "[i]t is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation." *Polanco v. City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018) (collecting cases). Indeed, there may be some aspects of Dr. Sargent's conduct that fall within the scope of her employment—giving rise to vicarious liability—and other aspects that occurred outside the scope of her employment—on which a negligent supervision claim could be based.

of any such conduct; (2) the VA took appropriate steps to ameliorate the situation after learning about the affair; (3) there is no evidence that Dr. Sargent's supervisors should have known about the affair before Dr. Sargent reported it to them; and (4) no evidence exists that Dr. Sargent previously engaged in sexual relations with patients or had a propensity to do so. (Dkt. 39 at 19-22). The Court finds Defendant's argument unpersuasive for the reasons that follow.

"Under New York law, a plaintiff asserting a claim for negligent supervision must prove: (1) the tortfeasor and defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels." *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011). When describing the "tortious propensities" of an employee, "[t]he common theme [in New York law] . . . is that for whatever reason—whether something about an employee's essential nature or something less permanent and more situational—she is unsuited for the task that she has undertaken to perform." *Id.* (collecting cases).

Plaintiff does not dispute that Dr. Sargent's supervisors did not know about her affair with Plaintiff before she disclosed it to them (Dkt. 40 at ¶ 110), or that the VA Hospital took appropriate steps after learning about the situation. However, there is a genuine dispute of material fact as to whether Defendant *should have* known that Dr. Sargent was unsuited to continue serving as Plaintiff's therapist because she had the propensity to enter into a relationship with Plaintiff or to have a sexual encounter with him. Dr. Sargent expressed to Dr. Wahlig and Brent that she "didn't know what else to do" and

- 25 -

that she was looking for suggestions about how to manage the situation with plaintiff better "because [she] had exhausted [her] approaches for setting boundaries," and she "did not know anything further that I could do to set the boundaries and to keep him from doing more." (Dkt. 42-2 at 223). As discussed earlier in this Decision and Order, the record before the court viewed in the light most favorable to Plaintiff shows that both Dr. Wahlig and Brent acknowledged that under the circumstances Plaintiff should have been transferred to a different therapist, but that both of them failed to communicate that sentiment to Dr. Sargent. (*Id.* at 251, 341).

Additionally, as previously discussed, it was well-known by staff members at the hospital that Plaintiff called Dr. Sargent "hot Dr. Sargent" (*id.* at 223), and that Plaintiff was giving Dr. Sargent extravagant gifts (*id.* at 165). Moreover, at least one of the staff members witnessed the incident where Defendant rode by the Buffalo VAMC on his motorcycle at Dr. Sargent's request (*id.* at 153, 223), and Plaintiff contends he and Dr. Sargent kissed in her office during a therapy session (Dkt. 42-2 at 155). A reasonable trier of fact could find that, in light of these incidents, Dr. Sargent's allegedly tortious behavior was committed, at least partially, on the premises of the Buffalo VAMC.

Moreover, the Buffalo VAMC was aware that Dr. Sargent frequently failed to take notes of her patients' therapy sessions or enter them in a timely manner. (Dkt. 42-1 at ¶ 29). The record shows that Brent was supposed to monitor Dr. Sargent's note entry after April 19, 2012, but that she still had few substantive notes by November 2012 and no notes at all for Plaintiff's final 15 therapy sessions. (*Id.* at ¶¶ 26, 29). Looking at the record in the light most favorable to Plaintiff, a reasonable trier of fact could find that the Buffalo

VAMC's failure to ensure that Dr. Sargent kept notes of her therapy sessions allowed her to conceal her affair with Plaintiff. Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiff's negligent supervision claim.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss (Dkt. 37) is denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: February 11, 2019
         Rochester, New York